CLINTON TRUST COMPANY, as Successor Trustee, etc., Plaintiff, *v.* 142–144 JORALEMON STREET CORPORATION and Others, Defendants.

Supreme Court, Kings County, January 9, 1934.

*Mark Hyman*, for the plaintiff.

*Celler & Kraushaar* [*Meyer Kraushaar* of counsel], for the defendant.

*Kantrowitz, Esberg & Solins*, for the Brooklyn Heights Medical Building, Inc., and another.

*Rabenold & Scribner* [*Louis G. Bernstein* of counsel], for the defendant Commonwealth Bond Corporation.

*William L. Carns*, for certain certificate holders.

*William Lehrman,* secretary of committee of bondholders consisting of Charles C. Hood and others.

*Charles F. Jekel,* president of Fraternal Home Insurance Society, for Fraternal Home Insurance Society, a holder of undeposited bonds.

*Henry Secon,* for certain bondholders.

Lockwood, J.  In June, 1927, the 142–144 Joralemon Street Corporation made a building and permanent mortgage for $570,000, with interest at six and one-half per cent per annum and amortization payable June and December first of each year until June 1, 1942, when the balance of principal remaining was to become due. The mortgage is a first lien on the thirteen-story Medical Arts Building erected for occupancy by doctors, dentists and other professions on the plot fifty by one hundred on the south side of Joralemon street just west of Clinton street, Brooklyn.

Bonds secured by said mortgage were sold to the general public through the Commonwealth Bond Corporation, a Delaware corporation authorized to do business in the State of New York.

In addition to said first mortgage, there was a second mortgage of $100,000 on the property held by Philip Leschnik.

In April, 1929, proceedings were instituted to foreclose the second mortgage because of a default in payment of interest and taxes. At the foreclosure sale, November 6, 1929, the property was bid in by the plaintiff, who later conveyed it to Brooklyn Heights Medical Building, Inc., a corporation owned by the holders of said second mortgage.

Under date of April 4, 1931, the Commonwealth Bond Corporation wrote the first mortgage bondholders that because of a default in payment of interest and taxes, it, as a committee, called for the deposit of the bonds.

On September 3, 1931, the Clinton Trust Company was duly appointed receiver of the rents and profits of said building.

The Clinton Trust Company, the successor trustee, then commenced an action to foreclose the first mortgage.  Defenses were interposed and the case tried in December, 1931, and judgment rendered in favor of the plaintiff.

Upon appeal, the plan of reorganization, sponsored by the Commonwealth Bond Corporation, was attacked by bondholders substantial in amount of holdings, and the Appellate Division of the Supreme Court, Second Department, unanimously reversed the judgment and remitted the matter to Special Term " to withhold the entry of judgment decreeing a sale, and of confirmation thereof until the grievances of the different bondholders can be heard and an opportunity afforded them to formulate a plan of reorganization

of the mortgaged property which is fair and just, the acceptability of which will have been tested by the deliberate approval or disapproval of a substantial number of bondholders, leading, it is to be hoped, to an agreement by a large majority if not by all." (*Clinton Trust Co.* v. *142–144 Joralemon Street Corp.*, 237 App. Div. 789.)

Thereafter the Commonwealth Bond Corporation, as committee for the bondholders, petitioned:

(a) That this court approve the committee plan for reorganization of the mortgaged premises;

(b) That this court direct the entry of judgment for foreclosure and sale and fix the expenses and compensation of the Clinton Trust Company, as trustee.

The defendant Rae Ranzel sought to remove the plaintiff Clinton Trust Company as successor trustee and as receiver.

The defendant William L. Carns, a bondholder, moved for an order directing the receiver to pay arrears of taxes out of funds in its hands.

Upon written consent of all parties, dated June 1, 1933, the motions, petitions and cross-motions were referred to Timothy J. Shea, as referee, to take testimony, to consider all matters in controversy, and any and all plans of reorganization, said reference to be deemed a step in the reorganization of the property under the provisions of chapter 729 of the Laws of 1933, known as the Burchill Law.

The referee held hearings in May, July and August, 1933, taking about 500 pages of testimony and admitting many exhibits in evidence. While at work preparing his report, he died November 10, 1933.

Subsequently all proceedings were by order to show cause brought before this court, all parties were heard, and the matters in controversy are now here for decision, including a motion made by the receiver to authorize it to lease two whole floors in the building, one to the Second District Dental Society and the other to the Kings County Dental Society, each for a term of five years from October 1, 1934, at an annual rental of $1,000, with an option of renewal to the tenants for an additional term of five years at $1,250 a year, the necessary structural alterations and decorations to be made by the receiver, tenants to have possession now without payment of rent until the beginning of the term October 1, 1934.

This project, conceived and erected at the peak of the boom, when prices for land, labor and material were at the highest, was launched with a prospectus claiming a value of $950,000 and an estimated yearly rental of $168,800.

Tenants moved in in October, 1927, and a year later, in 1928, the

high point in rentals was reached. Forty-eight doctors and dentists were in as tenants at from three dollars and sixty cents to four dollars and forty-eight cents a square foot; the stores were occupied; and the highest rental actually received in the top year was about $86,000, as compared with the expected $168,800. Today, January, 1934, the rent is on a yearly basis of $33,000.

In computing the value of the property, in line with the custom then prevailing, all rentable space was used as a basis, whether it was actually occupied or not. It was several years later before owners realized that empty space bringing in no income was of little help in paying taxes, operating expenses and mortgage interest.

The first trustee of this bond issue, the Central Mercantile Bank and Trust Company, was absorbed by the Bank of United States. After the latter institution failed, the appointment of the Clinton Trust Company as successor trustee was brought about.

The Commonwealth Bond Corporation named the Harriman Bank and Trust Company as depositary. Shortly before the latter institution failed, the Commonwealth itself was named depositary and it in turn was succeeded by the Underwriters Trust Company.

On the hearings the attorneys representing substantial minority bondholders asserted repeatedly that the reason why a majority of the bondholders had approved of the reorganization plan of the Commonwealth Bond Corporation, was because the Commonwealth alone or the trustee was in possession of the list containing the names and addresses of the bondholders, and the Commonwealth alone could, therefore, communicate with them, whereas these substantial minority holders had no list.

The many Commonwealth letters to bondholders disclose a single purpose — to secure the deposit of bonds. Many statements are at best " dealer's talk " and are not substantiated. The communications are silent as to important statements contained in the opinion of the appellate court.

Under date of March 15, 1933, the minority bondholders obtained an order from Mr. Justice Steinbrink, directing the successor trustee to deliver to their attorneys a list of all the bondholders in order that they might forward a communication. The said list was not furnished, the trustee taking the position that it had no list in its possession.

The original trustee by whom coupons were paid undoubtedly had a list, and it would seem the new trustee was in a position to have complied with the order of the court and to have obtained a list either from the liquidator in charge of the Bank of United States, the former trustee, or from the Commonwealth Bond Corporation, with whom the present trustee is apparently in close contact.

Recently, the right of this Delaware company — Commonwealth Bond Corporation — to act as a committee for bondholders in the State of New York has been questioned.

In his opinion in *Bank of Manhattan Trust Co.* v. *Silrap Construction Co.* (N. Y. L. J. July 19, 1933) Mr. Justice WENZEL, of this court, said in part: " The court believes first that the defendant Commonwealth Bond Corporation should be removed from the management and conduct of the property for the bondholders, for the reason that it delegates to itself powers which, under the laws of this State it may not exercise. Nor does its record in the history of this proceeding recommend it to the court as the agency best calculated to protect the interests of the investors in this mortgage. The fact that it represents so large a percentage of the bonds is not indicative of the confidence of the holders of the bonds in it. It held exclusively the list of bondholders and made the first and most frequent appeals — they were, in fact, by virtue of their position, almost able to dictate * * *. The incident of the furniture in the apartment is illustrative of the attitude of the Commonwealth Bond Corporation toward these bondholders, who have since May, 1931, paid three times over the price paid by the Commonwealth Management Corporation for it."

The appeal from this judgment has been argued and is awaiting decision.

Here in this case, *Clinton Trust Co.* v. *142–144 Joralemon Street Corp.* (237 App. Div. 789), the Appellate Division said, in part: " It is charged that, under its scheme of refinancing, Commonwealth, while professing the intention to serve the interests of such bondholders as shall agree to its plan of reorganization, manifests scant interest in those bondholders who do not agree thereto and fail to deposit their bonds."

The record here taken by the referee shows that in the Commonwealth reorganization of the Old Tudor Hall Apartments, Englewood, N. J., non-assenting, non-depositing first mortgage bondholders received $8.59 for each $1,000 bond.

The exhibit produced by the Commonwealth under date of July 14, 1933, reads in part as follows: " Subsequent to the delivery of the new bonds (Old Tudor Hall Apartments), Commonwealth Bond Corporation exchanged two $500 new bonds and 10 shares of stock for undeposited old bonds; and surrendered the old bonds to the Trustee for cancellation, in exchange for the distributed share of bid price. * * * Commonwealth Bond Corporation, therefore, received a net of $11,100 in new bonds, for cash consideration of $95.35."

Inquiry discloses that the old assenting Tudor Hall first mortgage

bondholders received new income bonds, the property went under the control of the Commonwealth Management Corporation and bond interest and taxes went unpaid. The new trustee started another foreclosure and within the past two weeks the property has again been sold and bought in by the Commonwealth as committee. It reports a new first mortgage about negotiated with a private party. The new money is to be used to pay arrears of taxes and fees and expenses and the old original first mortgage holders will receive new second mortgage income bonds. Presumably the Commonwealth Bond Corporation's subsidiary, the Commonwealth Management Corporation, will again operate the apartment.

In 1927, when the 142–144 Joralemon Street loan was made, the Commonwealth had as president and directors men well and favorably known in New York business and real estate circles.

Later the company was taken over by a former vice-president and his associates.

In October, 1930, the control of the Commonwealth (28,000 out of 50,000 shares of stock outstanding) passed to a new group for $25,000. The head of this group, the new president of the company, testified before the referee that he had no previous experience in real estate or mortgage business in New York city, but had spent five years in the real estate business in Florida.

The new owners considered a Commonwealth rehabilitation plan, but it was never consummated. It contemplated giving the holders of each $1,000 bond originally marketed by the Commonwealth a twenty-year paid-up endowment life insurance policy and a membership certificate in an organization known as the San Domingo Club — the stated purpose being to interest people in timber and other industrial development in the Republic of San Domingo.

The principal business of the company has become attempted reorganizations and an important asset is bondholders' lists.

Out of a total of forty-six Commonwealth bond issues, thirty-five or thirty-six were in default by the spring of 1933.

It now has about twenty-seven reorganizations under way or completed, and generally its plan is the same — give old first mortgage bondholders some no par value stock in the new owning company which stock is held in a voting trust under which the Commonwealth or its nominee is to continue in control of the property for a ten-year period, and the property is managed and operated by its subsidiary, the Commonwealth Management Corporation. The old first mortgage bondholders also receive second mortgage income bonds for their first mortgage bonds.

The new first mortgage is used to pay arrears of taxes, fees and other charges and expenses.

*The present situation of 142–144 Joralemon Street Corporation is substantially as follows:*

The land and building are assessed at (1933) $525,000.

One year's taxes and water rates, year 1933, amount to about $13,500.

The outstanding first mortgage bonds amount in principal to $546,500.

Interest on said bonds at the rate of six and one-half per cent is due and unpaid, from December 1, 1930, to date, more than three years.

One year's interest at six and one-half per cent on the outstanding bonds, $546,500, amounts to $35,422.50.

The building is about fifty per cent rented.

The total income for one year, September 1, 1932, to August 31, 1933, was $38,393.42.

The expenses, not including taxes, water rates and bond interest for the same year, were $26,549.62.

It is apparent to all that this fiscal year's balance of $11,843.80 will not pay the same year's taxes and water rates of $13,500, and the year's interest on the outstanding first mortgage bonds, which at six and one-half per cent, amounts to $35,422.50.

More important and most alarming is the drop in rental income since September 1, 1933 – - it is now at the rate of about $32,000 per year — and the accumulation of unpaid taxes and water rates which are a lien prior to the first mortgage and which amounted as of December 29, 1933, to over $100,000.

| Year | Taxes unpaid | Interest 7% to 1/1/34 |
|---|---|---|
| 1927 | $1,023 75 | $441 92 |
| 1928 | 8,905 00 | 3,531 92 |
| 1928 | 8,905 00 | 3,220 64 |
| 1929 | 8,645 00 | 2,824 04 |
| 1929 | 8,645 00 | 2,521 46 |
| 1931 | 7,860 00 | 1,467 20 |
| 1931 | 7,860 00 | 1,192 10 |
| 1932 | 8,010 00 | 934 50 |
| 1932 | 8,010 00 | 654 15 |
| 1933 | 6,405 00 | 298 90 |
| 1933 | 6,405 00 | 74 72 |
| Principal | $80,673 75 | $17,161 55 |
| Interest | 17,161 55 | |
| Total taxes and penalty to 1/1/34. | $97,835 30 | |

Water rates reported unpaid, 1929, $326.61; water meter charges to June, 1933, $970.50; water meter charges since June, 1933, unread.

Penalty interest on these tax arrears is at the rate of ten per cent after January 1, 1934.

The taxes for 1930 are said to have been paid by the second mortgagee while in possession.

The trustee and receiver permitted these tax arrears and penalties to accumulate, notwithstanding the provision of the order of the Supreme Court, Kings county, dated September 3, 1931, appointing it receiver and authorizing it, for the protection of the premises, to, among other things, " pay the taxes, assessments and water rates out of the moneys collected," and, notwithstanding the fact that it had on hand December 28, 1933, as trustee, the sum of $14,341.79, and on hand, as receiver, from the rents collected a balance of $43,911.59, on most of which it allowed interest at two per cent per annum while the city penalty was running along at seven per cent, and since January 1, 1934, has run at ten per cent, and further, notwithstanding the fact that a substantial bondholder has been repeatedly demanding that a large part of the moneys on hand be applied to the payment of taxes.

Section 1026 of the Greater New York Charter provides in part as follows: " Whenever any tax or assessment shall remain unpaid for three years or any water rent shall remain unpaid for four years the tax lien on the property will be sold to satisfy such arrears of taxes, assessments, or water rents." Thus, the investment of every bondholder on this property has been in jeopardy for a long time.

### THE COMMONWEALTH PLAN.

The Commonwealth Bond Corporation owns $2,000 of these bonds. Its directors and officers report they own none.

The amended plan of reorganization offered by the Commonwealth committee provides, briefly, that the committee will bid in the property at the foreclosure sale, then convey it to a new corporation, with sufficient shares of no par value stock to issue one share of stock for each $100 principal amount of deposited bonds.

The new corporation would also issue to the owners of deposited bonds a principal amount of " B " or junior mortgage ten year maximum, five per cent cumulative income bonds for the balance, the balance being the difference between a new senior or first mortgage loan, which they hope to obtain in an amount not to exceed $150,000 from some institution, and the total principal amount of deposited bonds.

In other words, the present bondholders will get no back interest, will receive some stock, which will be tied up in a voting trust for

probably ten years and will also receive second mortgage income bonds subject to a new institutional first mortgage of upwards of $150,000, which will be used largely to pay back taxes, commissions and fees. The Commonwealth Management Corporation will run the property.

COMMENT ON COMMONWEALTH PLAN.

This court is somewhat familiar with the situation in the mortgage market, and knows of the existing troubles of the mortgage companies, and is advised by representatives of insurance companies and savings banks that at the present time there is no institution which will make the loan contemplated in the plan. The Commonwealth representatives have been most indefinite and vague as to this new six per cent mortgage. Even if obtainable at this time, their estimated cost, ten per cent to cover, seems prohibitive. If we search the records, we find that where former first mortgage bondholders are given stock tied up in a ten-year voting trust, the stock is usually unmarketable and the new second mortgage income bonds rarely pay interest, sell for a song, and are frequently wiped out by the foreclosure of the new first mortgage.

As shown by the receiver's reports, the amount available for mortgage interest and taxes for the fiscal year ending September 1, 1933, was $11,843.80.

Using September, October and November as a basis, the net at the end of the current fiscal year September 1, 1934, will be $8,000.

| | |
|---|---|
| One year's taxes and water rates would be about | $13,500 |
| One year's interest at six per cent on a new $150,000 mortgage | 9,000 |
| Total | $22,500 |

Not alone will there be no money for bondholders, but there would be a deficit, and unless the bondholders were assessed, there would be a foreclosure of the new first mortgage, probably resulting in wiping out the second mortgage income bonds.

The proposed management of the property by a company with but a nominal financial interest therein does not appeal to the court as the best solution under the facts here disclosed.

The sponsors of this plan are thinking as of 1929 and the years before. Their experience was in the sale of securities in a mounting market. Like other bond companies, they made full loans because to cover their expense in selling and other overhead they had to get a substantially big fee. The financing of the mortgages on this property cost upwards of $100,000 — too large a burden for the property to carry.

The difficulties and obstacles were too great for the properties to surmount and most of the mortgage loans of all the bond companies fell down and went into foreclosure.

The depression became so widespread and its effects, especially on employment, were so great that hundreds of conservative loans held by the mortgage companies, the insurance companies and the savings banks defaulted and foreclosures followed.

To do the bondholders on this property any lasting good we must think in terms of 1934 and of conservative, economical and experienced property management. Only a reorganization so conceived and carried out can possibly, with the oncoming of better times, save the property and the investments therein.

For the reasons stated and in view of the unfortunate experience of first mortgage bondholders on properties to which practically the same plan has been applied by the Commonwealth and of the situation here, which calls for a radical readjustment and revision of values, the court is of the opinion that the proposed Commonwealth plan offers little or no hope for either this property or its bondholders.

Real estate men say that a parcel of real estate is best managed by an owner with a substantial investment therein or by the most reliable experienced experts whose offices are located nearest the property.

Here we have a good building, well located on Brooklyn Heights, the reorganization of which is being attempted by a Delaware corporation, with a place of business in Manhattan and officers residing in New Jersey. The trustee, the receiver and the managing agent all have their offices in Manhattan.

While this condition maintains, the building is about half rented, the yearly income decreases, and six years' taxes go unpaid. The offices of many of the long-established and most successful and reliable real estate firms in Brooklyn, who must have the contacts to secure tenants for this special type of building, remain open for business within a range of two short blocks of the property, and there is no evidence to show that they have ever been requested to help solve the problem.

The many bondholders, evidently people of small means, are widely scattered. The problem is, what plan adopted early in 1934, with conditions as we know them to be, will best serve these bondholders and give reasonable promise of some return of interest and perhaps ultimately of principal, if " trade improves, industry stirs, and confidence, so long absent, starts once more upon the return journey."

The owner of the equity, an experienced business man, operated the property for about a year, during which period he paid a full

year's taxes, and had more tenants and a bigger rental income than has the receiver who succeeded him.

Said equity owner has an investment of $80,000 cash, the cost to him of the $100,000 second mortgage, which he foreclosed to obtain title. He claims to have put an additional $50,000 into the property and he and his friends own $96,500 of the first mortgage bonds. He shows a willingness to join in a plan which this court thinks is far superior to the so-called Commonwealth plan and contains so much merit that it should be put in definite form and submitted promptly to the first mortgage bondholders for their consideration and action. It is generally as follows:

1. The owner agrees to pay the expense of printing and mailing the proposed detail plan to the bondholders. If said plan is accepted by all, the owner is to pay the entire expense of putting it into effect. If it is not accepted by all, but is accepted by more than two-thirds of the bondholders in amount, and proceedings under the Burchill Law are necessary to give effect to the plan, the expense of said proceedings is to be paid out of the income of the property — the items of expense to be subject to the approval of the court.

2. The present trustee has on hand a fund of $14,371.79. After deduction of the trustee's fees and its attorney's fees, to be approved by the court, the balance is to be paid over to the holders of the first mortgage bonds and accepted by them as interest for the period during which they have received no interest, December 1, 1930, to the date the new plan goes into effect. This distributes equally among all bondholders all the funds on hand that can be used for that purpose.

3. The receiver reported $43,911.59 in hand as of December 29, 1933. From that amount it has paid the city of New York, as per order of this court, December 30, 1933, $35,000 on account of arrears in taxes. This payment was ordered and made in order to save substantial penalties. An accounting of all receipts and disbursements of the receiver is to be made, its fees are to be fixed as are the proper charges and allowances for the referees and the attorneys. The expenses of the present committee may be allowed and paid in such amount as the court thinks reasonable, providing said committee co-operates with the owner and the other bondholders in the efforts to have the new plan adopted as proposed or as modified after the bondholders have an opportunity to consider and act on the same. The balance in the hands of the receiver is to be paid to the city of New York on account of back taxes.

4. The present amount of outstanding first mortgage bonds is $546.500. The owner produced at the last conference bonds amounting to $96,500 which he offered to surrender for subordina-

tion to the first mortgage bonds remaining. This offer, if accepted, will at once reduce the first mortgage from $546,500 to $450,000. In other words, the remaining first mortgage bondholders, instead of having a participation in a first mortgage of $546,500, will, by the surrender and subordination of the $96,500 of bonds controlled by the owner and his friends, have a participation in a first mortgage of $450,000. This offer is plainly of great benefit to the remaining bondholders.

5. The $450,000 first mortgage bonds remaining are to be extended for fifteen years from the date the plan takes effect, and the interest rate reduced from six and one-half per cent to three per cent per year, if earned. Said interest is to be cumulative after three years; that is, if not earned and paid in any six months' period after the third year, the unpaid interest will be credited and carried forward and paid when and if earned in the future. Bondholders must have in mind that the total rent now being collected from said building is at the rate of about $32,000 for the current year; that the running expenses, including fuel, light, repairs, supplies and salaries of employees, but not including taxes, are about $24,000 per year. Thus there is only $8,000 left to pay $13,500 in taxes water rates and bond interest. The owner, if the plan goes into effect, will have to devote his time, day in and day out, to secure new tenants, to run the building economically and to obtain a reduction in the taxes by getting the assessed value reduced. From every viewpoint the present assessed value of $525,000 is much too large. There will probably be no net earnings with which to pay interest for at least three, if not five, years, even if good times return because all the income will be required to pay current operating expenses and taxes and to pay on account of arrears of taxes and penalties which as of December 29, 1933, were $100,000, and which were reduced to $65,000 by the payment of $35,000 on account on December 30, 1933. Doctors and dentists have suffered in income more during the depression than perhaps any other professional group. The result has been that, to retain them as tenants, their rents had to be reduced. Many surrendered their offices and used the offices of others on a part-time basis.

6. All income from the property is to be controlled by proper agreement which will assure it being applied to operating expenses, including a reasonable management fee, taxes, water rates, assessments and insurance. The balance to be paid over monthly to a trustee, to be used by the trustee for the payment of taxes and interest on the bonds. The trustee to receive detailed monthly statements and have the right at all times to audit the owner's books.

7. All power, authority or control now vested by existing agreements with the Commonwealth Corporation or the Clinton Trust Company, as successor trustee, or the Underwriters Trust Company, depository, be eliminated, the said Commonwealth Corporation and the present trustee and depository to·resign upon payment of their fees if and as hereinbefore referred to under order of the court and such power and authority as is necessary to be lodged in a new trustee.

8. Any future surplus income remaining in the hands of the new trustee, after payment of all charges, including taxes and three per cent interest on said first mortgage income bonds as hereinbefore provided, to be divided as follows:

a. One-half for the purchase of first mortgage bonds at market not exceeding par for retirement.

b. One-quarter for additional interest on said first mortgage bonds.

c. One-quarter for interest on the second mortgage subordinated bonds.

This court has no power or inclination to impose any plan of reorganization on the bondholders. It has sought to find the facts and thus aid in the formation of a plan to be submitted to the people who invested their money — the bondholders — for their decision.

In considering this matter the bondholders must have in mind that their only security is the property and ·the only source to which they can look for income to pay their bond interest or principal is the same property.

Times have changed; they, like many others, have had no income on their investments for three years. Interest rates have been reduced by our savings banks from four and one-half to three per cent and the Federal government now prohibits business banks from paying any interest on daily balances subject to check. The sole hope of these bondholders lies in an efficient and an economical and intelligent management of the property, and a return of more prosperous business conditions.

The Appellate Division of this Department has announced that in these controversies and reorganizations the interest of the bondholders is of paramount concern.

In the study and consideration of this case the court has been guided by the opinion in *Clinton Trust Co.* v. *142–144 Joralemon Street Corp.* (237 App. Div. 789), in which the appellate court prescribed the procedure to be followed by this court in its consideration of the issues presented by these objectors. In that case the learned court said, in part: " The hearings which are directed may be conducted somewhat informally. Individuals as well as

committees should be permitted to offer suggestions. The Special Term may permit them to convene for any particular purpose or not, as seems to it expedient, taking evidence where it is thought necessary to preserve a record. In conducting the proceedings the court should exercise a wise and sometimes summary discretion * * *. Since the foregoing was prepared, events have moved rapidly; the financial depression has entered upon a new stage; bank holidays have been declared; funds have been locked up; freedom of action is curtailed.

" Due to these things a further doubt is cast on the intrinsic merit of the sponsored plan, particularly wherein Commonwealth is to fix its own compensation, negotiate a prior lien loan, nominate and control the voting trustees.

" These new conditions present new problems and furnish additional reasons for consultation and deliberation among those interested in the property in suit, and for the opportunity of a full hearing by the court."

The opinion of the Appellate Division on this case was handed down March 10, 1933. Since that time, the largest of the bond, mortgage and guarantee companies, with several billion dollars of first mortgages outstanding in the hands of the public, have gone into either rehabilitation or liquidation.

The Federal and State governments have extended aid in the acute mortgage situation to home owners and to other groups of mortgagees. Plans are pending for Federal assistance to guaranteed mortgage and certificate holders, but the court has no information of any Federal or State aid adopted or planned for the holders of unguaranteed mortgage bonds like those here under consideration.

As to the matters pending before the court:

The motion of the defendant Carns, bondholder, for an order directing the receiver to make payment on account of arrears of taxes was granted December 30, 1933, and the payment of $35,000 on account was directed and made and substantial penalty saved under the provisions of the new law.

The motion of the Commonwealth Bond Corporation to approve the so-called Commonwealth plan of reorganization and to direct the entry of judgment of foreclosure and sale is denied. If the new plan is approved as offered or is modified and approved, the old action of foreclosure can be discontinued. and thus a substantial saving effected for the bondholders.

The motion of the defendant Rae Ranzel to remove the Clinton Trust Company as trustee and receiver is denied upon condition that the Clinton Trust Company account and be discharged. The

attorney for the Clinton Trust Company has opposed the so-called Commonwealth plan and has co-operated with the court in the formation of the plan herein briefly outlined. The court assumes that the trustee and its attorney will further co-operate.

As to the motion of the receiver for leave to rent two floors to the two dental societies for five years at $1,000 per floor, with the privilege to the tenants to renew for additional five years at $1,250 per year for each floor, necessary structural alterations and decorations to be made by the receiver, tenants to have possession now without payment of rent until October 1, 1934, the same is denied.

The court inspected the premises with an outstanding expert who gave his time and advice without compensation. It seems that the rent offered is too low and the terms too long. The offer is at the rate of thirty cents per square foot, whereas present tenants pay two dollars and more per square foot. The free rent for nine months is unfair and unusual and the alterations would cost upwards of $2,000. Furthermore, to make open floors would require the tearing out of many partitions, as both floors are now subdivided into offices. It would cost upwards of $8,000 to replace said partitions if it were later found necessary. The proposed tenants are desirable for this building and negotiations should be continued with them with a view of arranging leases on more equitable terms.

The property was found generally in good condition. Located in the downtown district, subject to traffic and parking rules, it lacks a private parking space for the convenience of its professional tenants and their patients. The equity owner has stated he will seek to provide such space if the proposed plan is favorably received.

The court suggests the Kings County Trust Company as the new trustee.

All other motions are denied.

Submit orders on two days' notice. The court will appoint a referee to prepare a detailed plan in conference with the attorneys. The court will fix expenses and allowances, all of which will be modest in amount, as it is necessary for all parties to fully co-operate in the effort being made to pay some amount to bondholders at this time.

From the outset, this property, apparently well designed and well built, certainly well located, has been beset by misfortune. Overtaken by the world-wide business depression, and blighted by five years of litigation, the value and desirability of the building were adversely affected — former and present tenants disturbed, and prospective, desirable tenants driven away. The time has arrived to give the tenants quiet enjoyment and to give the property and the bondholders what in 1934 is known as "A New Deal."